J-S36032-21

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.Y., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.L., MOTHER | : | No. 1433 EDA 2021 |

Appeal from the Order Entered June 21, 2021
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002004-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.Y., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.L., MOTHER | : | No. 1434 EDA 2021 |

Appeal from the Order Entered June 22, 2021
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000134-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: M.Y., JR., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: Z.L., MOTHER | : | No. 1435 EDA 2021 |

Appeal from the Order Entered June 21, 2021
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002005-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.Y., Jr., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: Z.L., MOTHER | : | No. 1436 EDA 2021 |

Appeal from the Order Entered June 22, 2021
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000135-2020

J-S36032-21

IN THE INTEREST OF: K.M.R., Jr.,  :    IN THE SUPERIOR COURT OF
A MINOR    :          PENNSYLVANIA
    :
    :
APPEAL OF: Z.L., MOTHER    :     No.  1438 EDA 2021

Appeal from the Order Entered June 22, 2021
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000133-2020

BEFORE: LAZARUS, J., KING, J., AND COLINS, J.*:

MEMORANDUM BY COLINS, J.:        **FILED JANUARY 10, 2022**

Z.L. ("Mother") appeals from the decrees entered June 21, 2021, in the

Court of Common Pleas of Philadelphia County, which terminated involuntarily

her parental rights to her minor children, M.J.Y. (her daughter born in May

2011), M.J.Y., Jr. (her son born in May 2012); and K.M.R., Jr. (her son born

in April 2017) (collectively, "Children").  She also appeals from the orders

changing the permanency goals for M.J.Y. and M.J.Y., Jr. to adoption.[1]  Upon

---

* Retired Senior Judge assigned to the Superior Court.

[1] On June 21, 2021, the trial court conducted a simultaneous hearing on DHS's petitions to terminate the parental rights of all parents with respect to Children pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and DHS's petitions to change Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375.  In decrees entered on June 22, 2021, the trial court terminated involuntarily the parental rights of the father of M.J.Y. and M.J.Y., Jr.  K.M.R., Jr. has a different father than his siblings.  The trial court entered a decree on June 22, 2021 terminating the parental rights of any putative but unknown fathers of K.M.R., Jr.

 K.R., who DHS asserts is K.M.R., Jr.'s father, decided to sign a consent to adoption in lieu of defending against the petition to terminate his parental rights involuntarily filed by DHS.  Thus, the trial court continued the hearing with respect to DHS's petition to terminate K.R.'s rights and DHS's petition to
*(Footnote Continued Next Page)*

- 2 -

review, we affirm the decrees terminating Mother's parental rights to Children and the orders changing the permanency goals to adoption for M.J.Y. and M.J.Y., Jr.

We provide the following background. Philadelphia Department of Human Services (DHS) became involved with the family on June 24, 2018, after receiving a report alleging that Mother left M.J.Y. and M.J.Y., Jr., with their maternal great-grandmother and refused to retrieve them. N.T., 6/21/2021, at 13-14, 33; Dependency Petitions, 8/29/2018, at ¶ 5.[2] Mother

_____

change K.M.R., Jr.'s permanency goal. Mother filed an appeal from the June 21, 2021 order continuing K.M.R., Jr.'s goal change hearing, but this Court quashed the appeal because the June 21, 2021 order was not an appealable order. *See* 1437 EDA 2021.

On September 28, 2021, the trial court terminated that father's rights to K.M.R., Jr. and changed K.M.R., Jr.'s permanency goal to adoption. Mother filed a separate appeal from K.M.R., Jr.'s goal change order listed before this Court at 2181 EDA 2021. None of the fathers filed an appeal or participated in Mother's appeal.

[2] According to the trial court, on September 24, 2018, attorneys in Children's dependency matters stipulated to the statement of facts in DHS's dependency petitions seeking to have Children adjudicated as dependent children pursuant to the Juvenile Act. N.T., 6/21/2021, at 34. None of the attorneys objected to the trial court's assertion. *Id.* At the hearing, DHS entered Children's dependency dockets containing the text of the court orders as Exhibits 9-11. However, the detailed dockets indicate that the trial court's findings of facts in connection to Children's adjudications of dependency "are set forth in the record of this case." N.T., 6/21/2021, at DHS Exs. 9-11. None of the parties admitted any portion of the dependency record into the termination proceedings other than the detailed dockets.

We remind the parties and the trial court that "[t]ermination proceedings often occur simultaneously with dependency proceedings, but these two types of proceedings remain distinct, with their own docket numbers, records, and

*(Footnote Continued Next Page)*

first left M.J.Y. and M.J.Y., Jr., who were seven and six years old at the time, with Children's maternal great-grandmother. N.T., 6/21/2021, at 33, 137. After their maternal great-grandmother was unable to care for them, M.J.Y. and M.J.Y., Jr., moved to their paternal grandmother's home. Dependency Petitions, 8/29/2018, at ¶ 5. Mother, who had abandoned M.J.Y. and M.J.Y., Jr., in the past, told their paternal grandmother that she should contact DHS because Mother could not care for them and wanted to relinquish her parental rights. N.T., 6/21/2021, at 33; Dependency Petitions, 8/29/2018, at ¶ 5.

When DHS got in contact with Mother, she told them she felt depressed and overwhelmed, and she desired for paternal grandmother to care for M.J.Y. and M.J.Y., Jr. Dependency Petitions, 8/29/2018, at ¶ 5. At that time, K.M.R., Jr., who was slightly over the age of one, remained in Mother's care. Two days later, the agency discovered all three Children back in Mother's care. *Id.* Mother's home had no operable gas service in the home, prompting DHS to require that Mother make a family arrangement. N.T., 6/21/2021, at 15;

---

divisions within the Court of Common Pleas." *Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021). Because Mother appealed from the goal change orders entered in Children's dependency matters in addition to the termination orders, this Court has access to Children's dependency records. Therefore, this Court will cite to dependency petitions in accordance with the trial court's representation that the parties, including Mother, previously stipulated to the facts of those petitions. This Court cautions the parties and trial court that this is not always the case. *See id.* (vacating termination decrees and remanding for a new hearing after the trial court relied upon evidence from dependency matter in order to terminate parental rights without the evidence being admitted into the termination record and without a simultaneous dependency appeal).

Dependency Petitions, 8/29/2018, at ¶ 5. M.J.Y. and M.J.Y., Jr., went back to their paternal grandmother's care. Dependency Petitions, 8/29/2018, at ¶ 5. K.M.R., Jr. initially went to his maternal grandmother's home, but later moved to his paternal grandmother's home after Mother got into an altercation with K.M.R., Jr.'s maternal grandmother.

On August 29, 2018, DHS filed a petition alleging that Children were dependent under the Juvenile Act, 42 Pa.C.S.A. § 6302(1). On September 24, 2018, the trial court adjudicated Children dependent and transferred legal custody to DHS. Children remained with their respective paternal grandmothers, although eventually K.M.R., Jr. moved to the non-relative foster home where he currently resides.

DHS arranged for the Community Umbrella Agency (CUA) to provide services to Mother. CUA established single case plan objectives for Mother to achieve based on the issues Mother was facing. The objectives included attending parenting classes, obtaining suitable and safe housing, obtaining employment, obtaining a mental health evaluation and complying with the recommendations, and regularly attending visits with Children. N.T., 6/21/2021, at 16; *see also* DHS Exs. 9-11 (Children's permanency review orders indicating the trial court mandated similar objectives).

Over Children's almost three years in foster care, the trial court repeatedly determined in Children's dependency matters that Mother had no or minimal compliance with her objectives and made no or minimal progress

towards rectifying the conditions that brought Children into care. DHS Exs. 9-11. She did obtain appropriate housing in 2020. N.T., 6/21/2021, at 16. She also obtained employment driving for a ride service, although she did not provide a pay stub to the agency in response to the agency's last request. *Id.* at 16-17. She began but did not complete parenting classes. *Id.*

Mother's mental health evaluation had revealed a need for outpatient therapy to address her major depressive disorder, but Mother did not attend such a program. *Id.* at 18-20. The only mental health treatment Mother obtained was spending a week or two in an inpatient facility sometime in 2020. *Id.* at 25. Mother blamed her failure to obtain outpatient treatment on issues she had with obtaining insurance, but DHS provided her with information on providers who would treat Mother without a cost and Mother still did not take advantage of those programs. *Id.* at 20.

Mother's mental health remained an ongoing area of concern. In the DHS caseworker's view, at times Mother appeared eager to engage and get Children back, but other times she appeared upset, crying, and depressed. N.T., 6/21/2021, at 24, 33. In early 2020, Mother attempted to take M.J.Y. and M.J.Y., Jr., from paternal grandmother's custody without authorization. When she was stopped from doing so, Mother entered paternal grandmother's house and attempted to slit her wrists with a can opener. N.T., 6/21/2021, at 31-32. Paternal grandmother called the police, who took Mother to a hospital. When the DHS caseworker spoke to Mother, she told the caseworker

she planned to stay and obtain mental health treatment. *Id.* at 30. Instead, Mother left the hospital, returned to Paternal Grandmother's house, and "smashed up" the car of Paternal Grandmother's neighbor. *Id.* Paternal Grandmother obtained a restraining order against Mother, which has since expired. *Id.*

In addition to her mental health struggles – or perhaps because of such struggles - Mother failed to visit Children regularly. Initially, she had the opportunity to visit Children two times a week at the agency, but she only visited sporadically. *Id.* at 21-23. In the three months prior to the hearing to terminate her parental rights, Mother missed 15 out of 17 visits offered to her. *Id.* She never made enough progress to progress to unsupervised visits, let alone reunification. *Id.* at 28.

Based upon Mother's lack of progress, DHS filed petitions to terminate Mother's parental rights on February 21, 2020, as well as petitions to change Children's permanency goal to adoption. The trial court conducted a hearing on the petitions on June 21, 2021. Children, who were four, nine, and ten at the time of the hearing, were represented by an attorney serving as guardian *ad litem* and an attorney serving as legal counsel.[3]

---

[3] At the hearing, legal counsel represented to the court that Children had the following positions. M.J.Y.'s "first wish would be to go with [Mother]," but if that were not possible, M.J.Y. wished to stay with her paternal grandmother and brother M.J.Y., Jr. and for her paternal grandmother to adopt her. N.T., 6/21/2021, at 83-84. She appeared to understand the concept of adoption. *Id.* It was not clear whether the nine-year-old child, M.J.Y., Jr., understood

*(Footnote Continued Next Page)*

During the hearing, DHS presented the testimony of a CUA worker who was assigned to the family's case, and introduced Mother's psychological evaluation, CEU progress reports, and the docket from Children's dependency matters, which contained the text of the various court orders. N.T., 6/21/2021, at DHS Exs. 1-2, 8-11. In addition to the history discussed *supra* regarding Mother's lack of progress on her case objectives, DHS presented testimony regarding Children's needs and welfare. Mother testified on her own behalf.

At the conclusion of the hearing, the juvenile court entered a decree terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal.

On appeal, Mother raises the following arguments: (1) whether the trial court erred by terminating Mother's parental rights without clear and convincing evidence to support termination under 23 Pa.C.S.A. §§ 2511(a)(1),

---

the concept of adoption; his wish was more focused on simply being able to remain in his paternal grandmother's care. *Id.* The four-year-old child, K.M.R., Jr., referred to his foster mother as his mother, seemed too young to understand adoption, and did not mention Mother when asked about the people in his life. *Id.*

Children's guardian *ad litem* filed a brief indicating that affirming the termination of parental rights order is in Children's best interests. We note with disapproval that legal counsel did not file a brief on Children's behalf on appeal or otherwise advocate for Children's position.

(2), (5), and (8); and (2) whether the trial court erred by terminating Mother's parental rights without clear and convincing evidence that termination would best serve the needs and welfare of Children pursuant to 23 Pa.C.S.A. § 2511(b).[4]  Mother's Brief at 4.

We review these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[4] Mother filed notices of appeal from the orders changing M.J.Y. and M.J.Y., Jr.'s permanency goals to adoption in their dependency matters.  However, Mother did not include challenges to the goal changes in her issues presented or the argument section of her brief.  Her failure to develop these claims renders them waived.  *Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020).  Accordingly, we only consider the merits of her arguments relating to the termination of her parental rights pursuant to the Adoption Act. Nevertheless, even if Mother had preserved and presented issues regarding the change of her permanency goal pursuant to the Juvenile Act, we note that the court may terminate parental rights even if the permanency goal remains reunification.  *See In re Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006).  Moreover, any goal-change challenge would be moot in light of our decision to affirm the court's termination decrees.  *D.R.-W.*, 227 A.3d at 917 (quoting *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.")).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the juvenile court terminated Mother's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsections 2511(a)(8) and (b), which provide as follows.

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) … or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have summarized the requirements of subsection 2511(a)(8) as follows.

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).

Regarding subsection (a)(8), Mother argues that she remedied "the two main conditions" necessitating Children's removal by obtaining housing and employment. Mother's Brief at 15. She notes that she was only one class shy of completing parenting classes. *Id.* at 15-16. She emphasizes that the pandemic and her lack of insurance inhibited her ability to attend mental health treatment, and claims she calls every day to try to obtain a therapist. *Id.* at 15-16 (citing N.T., 6/21/2021, at 131). Furthermore, in her view, she has changed since Children came into care. *Id.* at 16.

- 11 -

The trial court, on the other hand, offered the following analysis to support its decision to terminate Mother's parental rights under subsection (a)(8). There is no dispute that Children have been removed from Mother's care for more than 12 months, having been legally removed from Mother's care in 2018. The trial court determined after three years, Mother still had not remedied the conditions that brought Children into care. According to the trial court, Mother "lacked the capacity to address her Children's basic emotional and physical needs," noting her "continuing disregard of parental duties," her "tendency to abandon her Children with relatives for extended time periods," her refusal or inability "to address her mental health problems" by not obtaining treatment, her failure to complete parenting classes, and her "rambling, unconvincing, and self-serving" testimony. Trial Court Opinion, 9/16/2021, at 5-7.

We discern no abuse of discretion in the trial court's conclusion that Mother had not remedied the conditions that brought Children into care. The record shows that at the time of Children's removal, Mother was struggling with her mental health and overwhelmed by parenting. She left the eldest two children with family and spoke of relinquishing her parental rights, only to retrieve them shortly thereafter to take them to live in a home with no gas service. Mother's mental health struggles have been an ongoing concern throughout the time Children were in care. Other than short-term inpatient

treatment, Mother did not obtain treatment to address her mental health, even though DHS told her where she could obtain treatment without cost.

Thus, despite Mother's arguments, DHS proved clearly and convincingly that Mother has not remedied all conditions that brought Children into care, including her mental health, which undoubtedly affects all other issues. *See In re D.A.T.*, 91 A.3d 197, 205-06 (Pa. Super. 2014) (observing that the agency may meet its burden under subsection 2511(a)(8) if a parent has not remedied each of the initial conditions). Moreover, despite Mother's plea that she has changed, "[t]his Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, the trial court did not abuse its discretion by determining DHS met its burden under subsection(a)(8).[5]

We now examine the trial court's determination that termination of parental rights best served Children's needs and welfare. We have explained the analysis under subsection 2511(b) as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection

---

[5] As our analysis of the last prong of subsection 2511(a)(8) is similar to our analysis under subsection 2511(b), we will address the last prong *infra*.

- 13 -

2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Parental rights may be terminated notwithstanding the existence of a parent-child bond. When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1992).

Here, the trial court examined the evidence of record and concluded that Children's primary bond was with their respective pre-adoptive kinship and foster parents, not Mother, and that Children would not suffer irreparable emotional harm if Mother's parental rights were terminated. *See* Trial Court Opinion, 9/16/2021, at 7. Further, the trial court noted that Mother has been unable to provide Children with a healthy, safe environment or meet their emotional, physical, and developmental needs for almost three years. *Id.* at

7-8. Children were bonded with their kinship and foster parents, and they have experienced stability in their care. *Id.*

Based on the evidence of record, we discern no abuse of discretion in the trial court's conclusions. Children have been in stable care for almost three years with caregivers who consistently meet their needs. Mother's failure to visit Children consistently surely impacted her relationship with Children. It is no surprise that only the eldest child, M.J.Y., had any semblance of a bond with Mother. Despite some positive aspects of their relationship, the trial court did not abuse its discretion in concluding the relationship M.J.Y. has with her kinship parent is the one to protect over the relationship she has with Mother. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). We agree with the trial court that nothing in the record suggests that terminating Mother's parental rights would cause Children, including M.J.Y., to suffer extreme emotional consequences and sever a relationship that is necessary to them. Therefore, the trial court did not abuse its discretion by determining that Children's needs and welfare was best served by terminating Mother's parental rights.

Based upon the foregoing, we conclude the trial court did not err or abuse its discretion by terminating Mother's parental rights. Mother waived her challenge to the change of the permanency goals for M.J.Y. and M.J.Y., Jr. to adoption. Accordingly, we affirm the decrees terminating Mother's parental

rights to Children and affirm the orders changing M.J.Y. and M.J.Y., Jr.'s permanency goals to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2022